Sophia M. Rios (SBN 305801)
srios@bm.net
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel: (619) 489-0300

Russell D. Paul (*pro hac vice* forthcoming)
rpaul@bm.net
Abigail J. Gertner (*pro hac vice* forthcoming)
agertner@bm.net
Amey J. Park (*pro hac vice* forthcoming)
apark@bm.net
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA MELTZER, individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>MAZDA MOTOR OF AMERICA, INC., a California corporation, and MAZDA MOTOR CORPORATION, a Japan corporation.<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br>(1)  Fraudulent Concealment/Omission<br>(2)  Unjust Enrichment<br>(3)  Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law<br>(4)  Breach of Implied Warranty under Pennsylvania law<br>(5)  Breach of Implied Warranty under the Magnuson-Moss Warranty Act<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Joshua Meltzer ("Plaintiff"), brings this action individually and on behalf of all persons in the United States, and in the alternative on behalf of all persons in the state of Pennsylvania who purchased or leased 2017 model year through present Mazda-branded vehicles ("Class Vehicles") against Defendants Mazda Motor of America, Inc. d/b/a Mazda North American Operations ("MNAO") and Mazda Motor Company ("MMC") (together with MNAO, "Mazda"). The allegations herein are based on personal knowledge as to Plaintiff's own conduct and are made as to other matters based on investigation by counsel, including analysis of publicly available information. Plaintiff alleges as follows:

## I.    INTRODUCTION

1.    Mazda manufactured, marketed, distributed, sold, warranted, and/or serviced the Class Vehicles.

2.    This is a consumer class action concerning the misrepresentation of material facts, the failure to disclose material facts, and safety concerns to consumers.

3.    Mazda manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles possessed a defect that materially affects the ability of drivers to properly operate the vehicles and provide safe, reliable transportation.

4.    Specifically, Plaintiffs allege that the Class Vehicles fail to properly inform the driver (1) when the vehicle is in Accessory mode or Ignition-on mode, rather than Engine-on mode, such that the vehicle's engine is not running, and (2) how to properly switch the vehicle from Ignition-on mode to Engine-on mode (the "Display Defect" or "Defect"). The Defect can cause drivers to mistakenly believe that the vehicle is in Engine-on mode and shift the vehicle out of Park and into Drive or Reverse when, in fact, the vehicle is in Ignition-on mode. Shifting a vehicle out of Park when the engine in Ignition-on mode but not in Engine-on mode unlocks the wheels such that the vehicle can then rollaway, causing a

collision. Because the engine is not on, the vehicle has no power to the engine, the transmission, or power steering, making it impossible for the driver to control a rolling vehicle through braking or steering or otherwise.

5.     Despite Mazda's knowledge, as early as 2016, of the existence and severity of the Defect, it touted the quality, durability, reliability, and performance of the Class Vehicles, as well as its driver interfaces, via its public statements and multimedia marketing campaigns.  Mazda also advertised that the vehicles were of high quality, with exceptional performance and comparatively low cost of ownership.

6.     Discovery will show that the Defect is the result of a design decision to remove the information about the status of the vehicle from the dashboard and display in the Class Vehicles.  Mazda vehicles produced earlier, from model year 2016 and before, display more information than the Class Vehicles, as do the vehicles of Mazda's competitors.

7.     The Defect is inherent in each Class Vehicle and was present at the time of sale or lease to each Class Member. The display software installed in the Class Vehicles is identical or substantially similar, in that Mazda has made no material changes to the software over the applicable timeframe, i.e. the production of the Class Vehicles. The Defect causes unsafe driving conditions, by confusing drivers, and substantially increases the risk of a collision.

8.     Mazda refuses to acknowledge the existence of the Defect and has failed to provide any repairs to the Defect or its effects. As such, Class Members are forced to pay out-of-pocket for repairs to their vehicle after collisions caused by the Defect, or use their collision insurance to repair the damage to their vehicles.  In this way, Mazda has unlawfully transferred the cost of the Defect onto consumers and third-party automobile insurers.

9.     Instead of providing updated software that correctly informs the driver of the state of the vehicle's engine, Mazda directs its authorized dealerships

to inform Class Members that their vehicles are operating as designed and that Mazda and its authorized dealerships will not fix the Class Vehicles.   In this matter, Mazda has purposefully concealed the existence and extent of the Defect, in order to transfer the costs of repairs from itself to unsuspecting consumers.

10.    The Defect not only decreases the value of the Class Vehicles, because there is no permanent repair, it can endanger drivers and passengers in the vehicles.  For example, when a driver mistakenly believes the engine is on and shifts out of Park while the vehicle is in Ignition-on mode, the vehicle can roll away.

11.    Despite knowing that the Class Vehicles are equipped the Display Defect, Mazda failed to disclose such information about the Defect to the public and failed to offer a permanent remedy for the Defect.  Rather, Mazda represented and continues to represent that the Class Vehicles have no defect and operate as designed.  Had Mazda disclosed the Defect, Plaintiffs and the Class Members would not have purchased their vehicles or would have paid less for them.

12.    When an automobile manufacturer sells a car, it has a duty under federal law to ensure that the car functions properly and safely and is free from material defects which undermine the ability of the vehicle to provide safe, reliable transportation. Federal law requires that when an automobile manufacturer discovers a defect, it must disclose the defect and remedy the problem or cease selling the car.  Further, when a company provides a warranty, it must honor that warranty. Mazda deceived its customers when it promised to stand by the warranties it issued to purchasers when it had no intent to do so, when it failed to honor the warranties by failing to provide repairs, when it sold vehicles that were not capable of providing safe, reliable transportation, and when it failed to disclose a safety defect in the Class Vehicles.

13.    Plaintiffs and Class Members reasonably expected that Mazda's representations that the Class Vehicles were properly engineered and programmed

and equipped to handle ordinary, public road driving would be true and complete and would not omit material information.  However, Mazda concealed and failed to disclose to Plaintiffs and members of the Classes that the Defect exists in the Class Vehicles and that there is a significant safety risk when the Class Vehicles can be shifted out of Park when the engine is not on. Moreover, Mazda concealed that, as a result of the Defect, the Class Vehicles will require significant, costly repairs.

14.    Based on pre-production testing and design failure mode analysis, ergonomic and human factors analyses, warranty claims, replacement part orders, consumer complaints, and competitor analyses, as well as other sources of internal data not available to consumers, as well as the deliberate decision to change the displayed information such that drivers are no longer told about the state of the vehicle's engine, Mazda was aware of the Defect in the Class Vehicles but concealed the Defect from Plaintiffs and Class Members. Indeed, despite being aware of the Defect and numerous complaints, Mazda knowingly, actively and affirmatively omitted and/or concealed the Defect's existence to increase profits by selling additional Class Vehicles and by unlawfully transferring the cost of repair to Plaintiffs and members of the Class Members.

15.    Mazda has exclusive knowledge of, and has been in exclusive possession of, information pertaining to the Defect, which was material to Plaintiffs and Class Members, who could not reasonably know of the Defect. Mazda has not disclosed the Defect to the purchasers or lessees, like Plaintiffs, at the point of purchase or through advertisements or marketing materials. Such full and complete disclosures would have influenced Class Members' purchase decisions and the purchase price they paid. Under all circumstances, Mazda had a duty to disclose the latent Defect at the point of sale of the Class Vehicles. Instead, Mazda failed and refused—and continues to refuse—to disclose the Defect and provide a meaningful remedy to those who have suffered economic harm as a

result of the Defect.

16.    The Display Defect is a latent defect that presents a safety risk to drivers and passengers and makes vehicles equipped with the Defect imminently dangerous. It makes the Class Vehicles unfit for the ordinary and advertised use of providing safe and reliable transportation. As such, the Defect presents a breach of the implied warranty of merchantability.

17.    Additionally, because Mazda concealed and failed to disclose the Defect, owners have suffered and continue to suffer substantial damages and should be entitled to the benefits of all tolling and estoppel doctrines.

18.    As a direct and proximate result of Mazda's concealment of, and failure to disclose, the Defect, Plaintiffs and Class Members: (1) overpaid for the Class Vehicles because the Defect significantly diminishes the value of the Vehicles; (2) have Vehicles that fail to inform them of the state of the engine;  (3) have and/or must expend significant money to have their Vehicles (inadequately) repaired; and (4) are not able to use their Vehicles for their intended purpose and in the manner Mazda advertised.

19.    In the United States, Mazda provides warranty coverage for Class Vehicles under one or more warranties.  For illustrative purposes, Mazda currently offers a 3-year/36,000 mile basic limited warranty and a 5-year/60,000 mile powertrain limited warranty for every vehicle, including the Class Vehicles.

20.    Mazda breached its implied warranties through which Mazda promised to, *inter alia*, provide Class Vehicles fit for the ordinary and advertised purpose for which they were sold.  Because the Defect was present at the time of sale or lease of the Class Vehicles and concealed from Plaintiffs and members of the Classes, Mazda, was required to repair or replace these components under the terms of the warranties.  Yet, discovery will show that Mazda has failed to repair or replace the defective and damaged parts, free of charge, under Mazda's warranties to ensure the Class Vehicles.

21.    Mazda's decision to sell the Class Vehicles without disclosing its specialized knowledge of the Defect also violates consumer state laws.

22.    Plaintiffs and Class Members have purchased and leased Class Vehicles that they would not otherwise have purchased or leased, or would have paid less for, had they known of the Defect at the point of sale. Plaintiffs and Class Members have consequently suffered ascertainable losses and actual damages. Moreover, Plaintiffs seek equitable remedies, including *inter alia*, an order that the Class Vehicles are defective and injunctive relief preventing Mazda from continuing its wrongful conduct as alleged herein.

## II.    THE PARTIES

**Plaintiff Joshua Meltzer**

23.    Plaintiff Joshua Meltzer is a Pennsylvania citizen residing in Ambler, Pennsylvania.

24.    On or around May 31, 2024, Plaintiff Meltzer purchased a new 2024 Mazda CX-50 from North Penn Mazda, an authorized Mazda dealership located in Colmar, Pennsylvania.

25.    Plaintiff Meltzer purchased his vehicle primarily for personal, family, or household use.

26.    Passenger safety and reliability were important factors in Plaintiff Meltzer's decision to purchase his vehicle. Before making their purchase, Plaintiff Meltzer researched the 2024 Mazda CX-50 online. At the dealership, Plaintiff Meltzer also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. Plaintiff Meltzer also discussed the safety features of the vehicle with dealership personnel, and was instructed about the operation of the vehicle by dealership personnel, who made no reference to the Display Defect, and further did not show Plaintiff Meltzer that the vehicle could be in Ignition-on mode and shifted out of Park. Plaintiff believed that the 2024 Mazda CX-50 would be a safe and reliable vehicle.

27.    Mazda's omissions were material to Plaintiff. Had Mazda disclosed its knowledge of the Defect before he purchased his vehicle, Plaintiff would have seen and been aware of the disclosures. Furthermore, had he known of the Display Defect, Plaintiff would not have purchased his vehicle.

28.    Shortly after purchase, Plaintiff Meltzer instructed his daughter on the use of the vehicle, going through the same information told to him by personnel at North Penn Mazda.

29.    On June 12, 2024, Plaintiff Meltzer's daughter attempted to drive the vehicle. At the time, the vehicle had approximately 500 miles on the odometer. She pressed the Stop-Start button. The display then informed her "Depress Brake to Start Vehicle." She then depressed the brake and shifted the vehicle out of Park and into Drive. The vehicle immediately began to roll backwards. She attempted to control the vehicle, including pressing the brakes, but both the power brakes and power steering were unresponsive. Unable to control the vehicle and in fear for her life, she jumped from the driver's door. The vehicle ultimately rolled until it jumped a curb and crashed into a tree in a neighbor's yard. To date, the vehicle has not been repaired but Plaintiff Meltzer had paid for the repairs to his neighbor's yard.

30.    The vehicle was towed to North Penn Mazda, which conducted an investigation with the assistance of MNAO. Ultimately, it was concluded by MNAO and the dealership *that the vehicle functioned as designed*. In particular, the service manager at the dealership informed Plaintiff that the accident occurred because the driver shifted the vehicle into Drive while the vehicle was in Accessory mode, which makes the car "impossible" to stop. Moreover, the service manager herself revealed that she had experienced this same situation when first using a Mazda vehicle with push-button start. At this time, Mazda has yet to provide any data or summary of the investigation itself.

31.    As a result of the Display Defect, Plaintiff Meltzer has lost confidence

in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Meltzer will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although he would like to do so.

32.  At all times, Plaintiff Meltzer and his daughter, like all Class Members, have driven the vehicle in a manner both foreseeable and in which it was intended to be used.

**Defendants**

33.  Defendant Mazda Motor America, Inc. ("MNAO") d/b/a Mazda North American Operations is a corporation organized and in existence under the laws of the State of California and registered to do business in the State of California. MNAO is headquartered in Irvine, California and is a wholly owned subsidiary of Mazda Motor Company ("MMC").

34.  MNAO is responsible for sales, marketing, service, distribution, import and export of Mazda-branded products, including vehicles and parts, in the United States. MNAO is also the warrantor and distributor of Mazda vehicles, including the Class Vehicles, throughout the United States.

35.  In order to sell vehicles to the general public, MNAO enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiffs.  In return for the exclusive right to sell new Mazda branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties MNAO provides directly to consumers who purchased new vehicles from the authorized dealerships.  All service and repair at an authorized dealership is completed according to Mazda instructions, issued through service manuals, TSBs, and other documents.  Per the agreements between MNAO and the authorized dealers, consumers such Plaintiffs are able to receive services under MNAO's issued warranty at dealer locations that are convenient to them.  These agreements provide MNAO with a significant amount

of control over the actions of the authorized dealerships.  For example, MNAO employees are appointed as managers for particular regions of the United States and their responsibilities include managing the day-to-day operations of the dealerships located within their regions.  MNAO also advertises its close relationship with its authorized dealerships on its website, stating that it "oversees the sales, marketing, parts and customer service support of Mazda vehicles in the United Sates and Mexico through nearly 700 dealers."[1]

36.    MNAO is MMC's designated agent with regards to MMC's responsibility as an automobile manufacturer under federal motor vehicle laws and is responsible for liaising, communicating, and cooperating with the National Highway Traffic Safety Administration ("NHTSA") for the purposes of monitoring safety complaints, investigating automobile defects, and conducting recalls.

37.    Discovery will show that MNAO also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional material relating to the Mazda Class Vehicles.

38.    Defendant Mazda Motor Company is a Japanese corporation founded in 1920 under the laws of Japan and headquartered in Fuchu, Hiroshima, Japan.

39.    MMC designs, engineers, manufactures, tests, markets, supplies, sells, warrants, and distributes Mazda-branded vehicles and parts for those vehicles worldwide, including in the United States. MMC is the parent corporation of MNAO, as well as all world-wide Mazda manufacturing facilities.  MMC provides all the technical information for the purposes of manufacturing, servicing, and repairing the Class Vehicles worldwide, including in the United States.

40.    Discovery will show that the decision to found MNAO in California

---

[1] See, e.g., https://news.mazdausa.com/2016-12-12-mazdas-turbocharged-skyactiv-engine-wins-2017-wards-10-best-engines-award

and register it as a California corporation was made by MMC.

41.     Discovery will show that the relationship between MNAO and MMC is governed by an agreement that gives MMC the right to control nearly every aspect of MNAO's operations—including sales, marketing management policies, technical information, servicing instructions, governance policies, pricing, and warranty terms.

42.     Defendants, through their various entities, design, manufacture, market, distribute, service, repair, sell and lease Mazda-brand passenger vehicles, including the Class Vehicles, nationwide and in Pennsylvania.

43.     Defendants also worked together on the drafting and distribution of all advertising materials and technical bullets regarding the Class Vehicles to authorized dealers, as well as in training Mazda-dealer technicians in the correct procedures to maintain, service, and repair Mazda vehicles.

44.     At all relevant times, Defendants were and are engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in California and throughout the United States.

### III.    JURISDICTION

45.     This is a class action. This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than MNAO and MMC, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. *See* 28 U.S.C. § 1332(d)(2)(A).

46.     In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.  Further, this Court

1  may also exercise supplemental jurisdictions over Plaintiffs' Magnusson-Moss
2  Warranty Act claims.

3      47.    This Court has personal jurisdiction over MNAO because it is
4  incorporated in the State of California; has consented to jurisdiction by registering
5  to conduct business in the state; maintains sufficient minimum contacts in
6  California; and otherwise intentionally avails itself of the markets within California
7  through promotion, sale, marketing and distribution of its vehicles, which renders
8  the exercise of jurisdiction by this Court proper and necessary as Mazda is "at
9  home" in California.

10     48.    This Court has personal jurisdiction over MMC because it maintains
11  sufficient minimum contacts in California, conducts business frequently in
12  California by selling Mazda-branded vehicles and car parts in California, transmits
13  and mails technical information about the vehicles and their components to
14  MNAO and other contacts in California, and otherwise intentionally avails itself
15  of the markets within California through promotion, sale, marketing, and
16  distribution of its vehicles, which renders the exercise by this Court proper and
17  necessary.

18     49.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c).
19  A substantial part of the events or omissions giving rise to the claims occurred in
20  this District, MNAO is deemed to reside in this district pursuant to 28 U.S.C. §
21  1391(a), MNAO is incorporated here, and Defendants are subject to personal
22  jurisdiction here by conducting business within the State of California.

23          **IV.    FACTUAL ALLEGATIONS**
24     **A.    BACKGROUND OF DISPLAY DEFECT**
25     87.    Mazda manufactured and sold the Class Vehicles with the Display
26  Defect and then failed to disclose the Defect for years, concealing the true nature of
27  Defect and vehicles from consumers who—unbeknownst to them—were driving
28  vehicles that had a serious safety-related defect because the display does not provide

correct information about the state of the engine and further fails to give the driver correct instructions on properly starting the engine.

88.    MMC designed and manufactured the Class Vehicles, including their displays, and then MNAO imported, distributed, marketed, warrantied and sold the Class Vehicles in the United States.  MNAO also provides service and maintenance for the Class Vehicles through its extensive network of authorized dealers and service providers nationwide, distributing technical information drafted jointly by MNAO and MMC.  Mazda has sold, directly or indirectly, through dealers and other retail outlets, millions of Class Vehicles in Pennsylvania and nationwide.  The United States is Mazda's largest market and MMC reported revenues of $30.15 billion, $28.7 billion, $32.77 billion, $32.11 billion and $31.47 billion for each of the years that the Class Vehicles were being sold as new cars via authorized dealerships, and at least $25.5 billion for each subsequent year through 2023.

89.    As with most modern cars, the Class Vehicles are equipped with Push-Button Start, a feature which replaced the turn-key ignition of earlier vehicles.

90.    Whether equipped with Push-Button Start or turn-key ignition, modern vehicles have several modes. The first, Accessory mode, allows electrical charge from the vehicle's battery to turn on certain accessory equipment in the vehicle, such as the radio, while the engine remains off.  The second, Ignition-on mode or "key-on-engine-off" for vehicles with a key, provides power to the onboard computers, such as the engine control module, so that software updates can be made while the vehicle's engine is off. Ignition-on mode also unlocks the wheels so that mechanics and dealership technicians can attempt to diagnose any engine or axle problems, rolling the wheels to see how the crankshaft moves. However, other systems, including the engine, transmission, power brakes, and power steering, remain off. The third, Engine-on mode, turns on the engine via the starter and provides power to all systems, including to the safety systems, such as anti-lock braking, and to the transmission.

91.     For vehicles that utilize a key, these modes are indicated both on the area where the key is inserted and on the dashboard. For vehicles that utilize a Push-Button Start, drivers are entirely dependent on the vehicle's dashboard or display to inform them which mode the vehicle is in.

92.     In most vehicles with a Push-Button Start, including the Class Vehicles, in order to turn put the vehicle into Accessory mode, the driver needs to push the Start Button once from the off position with their foot off of the brake. In order to put the vehicle into Ignition-on mode, the driver needs to push the Start Button twice from the off position with their foot off of the brake.  In order to turn the engine on (i.e. put the vehicle into Engine-on mode), the driver needs to press the button once from the off position with their foot depressing the brake.

93.     If a driver fails to depress the brake sufficiently while pressing the Start button in an attempt to start the car, a driver can unintentionally and unknowingly put a Class Vehicle, with Push Button Start, into Accessory mode or Ignition-on mode.

94.     Automakers such as Toyota are well-aware of this and as such, they specifically design their vehicles to alert drivers to the mode of their vehicles.

95.     Prior to model year 2017, Mazda vehicles would display the following message on the dashboard if the vehicle was in Ignition-on mode and not in Engine-

on mode: "To start, step on Brake Pedal and press Start Button". This is the message displayed in a 2015 Mazda CX-5, as displayed in Photograph 1.



PHOTOGRAPH 1

96.     Subsequently, for unknown reasons, Mazda changed the message on the dashboard of its vehicles, including the Class Vehicles, to read instead "Depress Brake Pedal to Start Engine."  This is the message displayed in Photograph 2, below, in a 2021 CX-9:



PHOTOGRAPH 2

CLASS ACTION COMPLAINT

97.    This is the same message displayed on the dashboard of a 2023 CX-50, as shown in Photograph 3 below, as well as in all Class Vehicles, including Plaintiff's.



PHOTOGRAPH 3

98.    Unfortunately for Plaintiff and Class Members, this instruction is the only warning, aside from half-centimeter orange light on the Start Button itself which may be blocked from the driver's view by the steering wheel, that the vehicle is not in Engine-on mode and thus the vehicle's engine is not running. See, e.g., Photograph 4, taken in 2023 CX-5:



PHOTOGRAPH 4

99.    This half-centimeter orange light is wholly inadequate and does not inform the driver that they are not in Engine-on mode, and does not inform the driver what mode they are actually in – either Accessory mode or Ignition-on mode.

100.    Further, this revised instruction message fails to explicitly inform the driver that they are not in Engine-on mode and also that they need to press the Start Button again while depressing the brake pedal in order to turn the engine on (i.e. put the vehicle into Engine-on mode).

101.    The failure to inform the driver: (1) that the vehicle is not in Engine-on mode; (2) what mode the vehicle is actually in (either Accessory mode or Ignition-on mode) because of an inadequate half-centimeter orange light on the Start

Button itself, inadequate dashboard displays and the omission of material information on the dashboard display message; and (3) how to safely and properly put the vehicle into Engine-on mode from either Accessory mode or Ignition-on mode, constitutes the Defect.

102.   The results of failing to inform the driver of this additional step of needing to press the Start button again to turn the engine on can be catastrophic for drivers of Class Vehicles as it was for Plaintiff if the vehicle is in in Ignition-On mode.

103.   While Mazda vehicles in Accessory mode cannot be shifted out of Park, Mazda vehicles in Ignition-on mode can be shifted out of Park. All the driver needs to do is follow the instruction on the dashboard to depress the brake pedal (without also simultaneously pressing the Start Button as the pre-2017 warning told them to do), and then the shifter will allow the driver to shift the vehicle out of Park. This unlocks the vehicle's wheels. At the same time the wheels are unlocked, the power brakes and the power steering will not function because, since the engine is not on because the vehicle is not in Engine-on mode, there is no power being supplied to these vehicle functions. If the vehicle is on even the slightest incline or decline when this occurs, the vehicle will immediately begin to roll. Without power from the engine to run the transmission, power brakes, or power steering, it is impossible to control (i.e. steer or brake) the vehicle.

104.   While the driver whose vehicle is in Ignition-on mode shifts the vehicle out of Park and without simultaneously depressing the brake pedal because they have not been instructed to do so after 2017, the driver may think they are in Drive, Reverse or Neutral and that they may be able to control the vehicle steering or brakes, but they cannot because the engine is not on and the transmission has not in fact shifted into Drive, Reserve or Neutral.  Instead, the only thing the driver has accomplished is to unlock the wheels so that the vehicle can now roll.

105.    Mazda, and other vehicle manufacturers, are well-aware that the likelihood of such an occurrence is high.  However, Mazda, unlike other vehicle manufacturers, omits the critical information that the driver also needs to press the Start Button again while depressing the brake pedal, which increases the chance that a driver will follow Mazda's explicit instruction to depress the brake (and not simultaneously press the Start button because there is no instruction to do so) and thus take a vehicle out of Park and unlock the wheels while the vehicle remains in Ignition-on mode.

106.    Mazda display messages do not meet industry standards for displaying correct information to drivers.  For example, the dashboard messages in Toyota vehicles leave the driver with no room for doubt.  When the vehicle is in Accessory mode, the dashboard says: "ACCESSORY" and further instructs "Press Brake and Push Engine Start Switch", as depicted in Photograph 5 below of messages in a 2022 Toyota Highlander. Toyota also includes pictures of its instructions, to remove all doubt.




PHOTOGRAPH 5

CLASS ACTION COMPLAINT

107.   Similarly, in a Toyota, if the vehicle is in Ignition-on mode, the vehicle display makes it crystal clear to the driver that the vehicle's engine is not yet on and that to turn the engine on, the driver needs to press the brake pedal and push the power switch to start.   See Photograph 6, below, taken in a 2023 Toyota RAV4 Hybrid, which proclaims in capital letters "IGNITION ON" and "NOT READY TO DRIVE":



PHOTOGRAPH 6

108.   Discovery will show that Mazda, despite knowing that drivers were likely to mistakenly place their vehicles in Ignition-on mode, rather than Engine-on mode, chose to design a warning that increased the likelihood of a collision by instructing the driver to place their foot on the brake only, without telling them to simultaneously press the Start button.   As a result, the Class Vehicles not only fail to warn the driver of the danger of not being able to control the vehicle, they actually instruct the driver on how to place the vehicle in a more dangerous situation by rolling away.

1

**B.    MAZDA'S WARRANTIES**

2      109.    Mazda provided all purchasers or lessees of the Class Vehicles with a

3  New Vehicle Limited Warranty ("NVLW") and Powertrain Limited Warranty

4  ("PTW").[2]  The terms of these warranties are non-negotiable and Mazda exercises

5  sole authority in determining whether and to what extent a particular repair is

6  covered under the warranties it offers.

7      110.    Design defects, such as the Display Defect, are not covered under

8  Mazda's warranty.

9      111.    Mazda's warranty booklet informs consumers that the warranty is

10  offered by both MNAO and MMC.

11

## AN IMPORTANT MESSAGE FROM MAZDA

12

13  We thank you very much for choosing Mazda. We at Mazda design and build vehicles with

14  complete customer satisfaction in mind. From the moment you get behind the wheel of your new Mazda, you'll notice how good it feels. A feeling you'll appreciate for as long

15  as you own your Mazda.

16  You'll also be pleased to know how strongly we stand behind every Mazda Vehicle. The New Vehicle Limited Warranty and the Powertrain Limited Warranty described in this

17  booklet is one of the finest available.

18  Together with your Owner's Manual, this warranty booklet details the operating procedures and intervals between maintenance that we recommend you follow to

19  maximize the performance of your Mazda.

20  In addition, your authorized Mazda Dealer will take care of all your service needs using

21  Genuine Mazda Parts. They'll do all they can to ensure that your Mazda Vehicle continues to exceed all your expectations.

22  At Mazda, it's not enough to sell vehicles that look impressive in the showroom.

23  We're committed to making sure you enjoy your Mazda for years to come.

24                    **Mazda Motor Corporation**
**and**

25           **Mazda North American Operations**

26

27

28  [2] https://www.mazdausa.com/owners/warranty

112.    The NVLW for the Class Vehicles stated, in relevant part:

1.  What is Covered

The New Vehicle Limited Warranty period is 36 months or 36,000 miles whichever comes first. This Limited Warranty period begins on the Date of First Service. "Date of First Service" means the first date the Mazda Vehicle is delivered to the first retail purchaser, is leased or is placed into service as a company vehicle use (e.g., as a demonstrator, rental or fleet vehicle), whichever is earliest. This Limited Warranty does not mean that each Mazda vehicle is defect free. For this reason, Mazda provides this Limited Warranty in order to remedy during the warranty period any such defects in materials and workmanship of all parts and components supplied by Mazda subject to the exclusions indicated under "Exceptions" and "What is Not Covered". The vehicle must be brought to an authorized Mazda dealer for all warranty service. The authorized Mazda dealer will without charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts. This transferable Limited Warranty is included with all new Mazda vehicles sold in the United States.[3]

**A.    Mazda's Omissions and Misrepresentations Regarding the Class Vehicles**

113.    Notwithstanding Mazda's knowledge of the Defect, as more specifically explained herein, Mazda, through media outlets including Mazda media, touted the ability of the Class Vehicles to be driven safely and reliably. The most basic task of any vehicle is to provide transportation, but Mazda failed to disclose the Defect interfered with that purpose in any of its statements about the Class Vehicles, including in brochures, Moroney Stickers, warranty booklets, and owner's manuals. Mazda's statements about the Class Vehicles consistently touted the safety of the vehicles, without mentioning the Defect and its associated safety risks.

114.    Defendant MNAO maintains a number of websites that advertise the safety and reliability of the Class Vehicles.  On InsideMazda.com, Mazda touts,

---

[3]https://www.mazdausa.com/siteassets/pdf/owners-optimized/optimized-warranty-booklet/2022-warranty-booklet.pdf

"[t]he brand's flagship midsize crossover is elegantly refined while offering the safety and versatility needed to discovery roads not yet taken."[4]

115.   Moreover, Mazda's U.S. president, Jeff Guyton, is quoted as saying, "We are committed to providing the most advanced safety technologies in our vehicles, and we continue to challenge ourselves to create unique products and technologies, which provide our customers a confident, relaxing, joyful driving experience."[5]

116.   The website also lists only the following modes for a 2024 CX-50, all for the driving modes selectable by the driver when the engine is on:

| Mi-Drive | Mazda Intelligent Drive Select (Mi-Drive) technology allows you to instantly choose from different drive modes, so your connection to the road stays natural and intuitive across a wide variety of driving scenarios. |
| --- | --- |
| Drive Modes | Choose from Normal Mode for an ideal balance of performance and efficiency, Sport Mode for more responsiveness, Off-Road Mode for maximum traction or available Towing Mode. [5] |
| Towing Mode | Available on CX-50 2.5 Turbo models, Towing Mode helps keep the CX-50 stable while hauling up to 3,500 lbs. [2] |

117.   Mazdausa.com also touts the safety of the 2024 CX-50, stating:

SAFETY

## DRIVE WITH A SENSE OF SECURITY

With the i-Activsense® suite of safety features, sophisticated safety innovations alert you to hazards to help you avoid collisions or lessen their impact. [15]

---

[4] https://insidemazda.mazdausa.com/the-mazda-way/cars-for-drivers/cx-9-an-invigorating-drive/

[5] *Id.*

118.    Mazda's brochure for the 2023 CX-50 also touts the advanced safety features, "[t]echnology that works in concert with the driver, to help you stay in the moment, and be one with your drive."   However, Mazda omits the most basic information, whether the engine is properly on, and includes a dashboard message which can confuse a driver into shifting out of Park while still in Ignition-on mode.

### HEIGHTENING YOUR AWARENESS, IN EVERY DIRECTION.

A trip into nature is rife with anticipation, and an occasional obstacle. To enjoy a more intuitive relationship with your surroundings, we created our i-Activsense® suite of safety features.[1] Technology that works in concert with the driver, to help you stay in the moment, and be one with your drive. Smart Brake Support (Front Drive Detection)[2] warns you of slower or stopped vehicles in your lane ahead and will even brake for you should you not respond. Driver Attention Alert,[3] Blind Spot Monitoring[4] and Rear Cross Traffic Alert[4]—all standard— are designed to help you avoid collisions. With the available 360° View Monitor,[5] you can see the perimeter of your car to help you maneuver into tight, remote spaces. And with High Beam Control, you can increase your visibility, and noticeability for fellow drivers on desolate country roads.

119.    Similarly, the Moroney Sticker for Plaintiff's vehicle detailed the safety features, but failed to mention the Defect. Further, neither the owners' manual nor the warranty booklet note that Ignition-mode is even possible, only that vehicles cannot shift out of Park in Accessory mode.  This is further underscored by the dealership employee who told Plaintiff that his vehicle was in Accessory mode during the collision when, in fact, it was in Ignition-on mode.

120.    Mazda had numerous opportunities to warn prospective purchasers that the Class Vehicles contained a serious defect that affects the ability of the cars to be driven, but also carried a significant associated safety risk of increasing the risk of collisions.  But none of the statements that Mazda published and distributed about the vehicles, including brochures, commercials, fact sheets, window stickers, warranty booklets, and owner's manuals contained any mention of the Defect.

121.    Mazda further touts the Class Vehicles and makes other express representations and warranties about their quality, durability, and performance.

However, in truth, Mazda knew before selling the Class Vehicles that they suffered from the Defect, but never disclosed that knowledge. Had Mazda disclosed that knowledge, Plaintiffs and Class Members would not have purchased their vehicles or would not have purchased them for the same price.

### C.    MAZDA HAD EXCLUSIVE AND SUPERIOR KNOWLEDGE OF THE DEFECT

122.    Mazda fraudulently, intentionally, negligently and/or recklessly omitted and concealed from Plaintiffs and members of the Class the Defect in Class Vehicles, even though Mazda knew or should have known of the defects in the Class Vehicles.

123.    Knowledge and information regarding the Defect were in the exclusive and superior possession of Mazda and its network of authorized dealerships, and that information was not provided to Plaintiffs and Class Members– either before their purchase or lease of Class Vehicles or when they sought repairs for their vehicles.  Based on Mazda's decision to change the display message from "To start, press on Brake Pedal and press Start Button" to "Depress Brake Pedal to Start Engine," Mazda was aware or should have been aware of the Defect in the Class Vehicles.  Instead, Mazda fraudulently concealed the Defect and its associated safety risk from Plaintiffs and members of the Classes.

124.    Mazda knew, or should have known, that the Defect and the associated safety risk was material to owners and lessees of Class Vehicles and was not reasonably discoverable by Plaintiffs and Class Members before they purchased or leased Class Vehicles or within applicable warranty periods.

125.    Notwithstanding Mazda's exclusive and superior knowledge of the Defect, Mazda failed to disclose the Defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continues to sell Class Vehicles suffering from the Defect.  Mazda intentionally concealed that the Defect

1  presents a safety risk to consumers, including Plaintiffs and Class Members, and the
2  public.

3      126.  In fact, before the first Class Vehicle went on sale, Mazda put the
4  vehicle through its extensive pre-production testing to both find flaws and decide
5  which it would correct prior to sale. Mazda's testing, like all vehicle manufacturers,
6  is divided into three parts: 1) mule testing; 2) early prototype testing; and 3)
7  production line testing.  The first phase, mule testing, takes place after the concept
8  car phase and often precedes years before a vehicle is placed into production.  Early
9  prototype testing takes place approximately a year to two years before production,
10  while production line testing takes places six to nine months prior to production.
11  Each of these phases is designed to review defects in vehicles, including in any of
12  their components, prior to being mass-produced.  Testing of Human Machine
13  Interface, or the input of drivers to the vehicle via touchscreens, buttons, and voice
14  commands, is also part of pre-production testing.

15      127.  As noted by Mazda, its pre-production testing is significant.[6] In fact,
16  Mazda maintains multiple proving grounds, where its vehicles, including the Class
17  Vehicles, were thoroughly tested including at the Miyoshi Proving Ground in
18  Hiroshima, Japan.  Mazda also tested the Class Vehicles at Ford's Arizona Proving
19  Grounds in Wittmann, Arizona for testing. This extensive preproduction testing
20  would have necessarily revealed the Defect to Mazda in 2016, prior to the sale of
21  any of the Class Vehicles.

22      128.  Discovery will show, that since the Class Vehicles have been in
23  production, Mazda has also received an overwhelming number of warranty and
24  goodwill repair requests for complaints related to the Defect.  However, Mazda
25  refuses to provide any warranty coverage or goodwill repairs for the Defect and
26  refuses to correct the Defect.

27
28      ──────────────
   [6] *See* https://insidemazda.mazdausa.com/the-mazda-way/cars-for-drivers/extreme-measure/

129.  Federal law requires automakers like Mazda to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to the National Highway Traffic Safety Administration, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

130.  Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety related. *Id*.

131.  Despite many reports from its consumers regarding the Display Defect, and its subsequent investigations of the incidents and collisions caused by the Display Defect, Mazda has at no time reported the issue to NHTSA, nor issued a communication, repair, or any other acknowledgment of the Defect's existence. To the contrary, Mazda only states that the vehicles are operating as designed, as with Plaintiff's experience.

**D.    FRAUDULENT CONCEALMENT ALLEGATIONS**

132.  Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Mazda responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles.  Mazda necessarily is in possession of or has access to this information.

133.  Plaintiffs' claims arise out of Mazda's fraudulent concealment of the Defect and the problems the Defect causes, and its representations about the quality, durability, and performance of the Class Vehicles, including their engines.

134.  To the extent that Plaintiffs' claims arise from Mazda's fraudulent concealment, there is no one document or communication, and no one interaction,

upon which Plaintiffs base their claims.  Plaintiffs allege that at all relevant times, including specifically at the time they purchased or leased their Class Vehicles, Mazda knew, or was reckless in not knowing, of the Defect; Mazda was under a duty to disclose the Defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it, and Mazda never disclosed the Defect to Plaintiffs or the public at any time or place or in any manner, including during Plaintiffs' service appointments at Mazda authorized dealership.

135.   Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to Mazda:

      a. ***Who***: Mazda actively concealed the Defect from Plaintiffs and Class Members while simultaneously touting the quality, durability, safety, and performance of the Class Vehicles. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Mazda responsible for such decisions.

      b. ***What***: Mazda knew, or was reckless or negligent in not knowing, that the Class Vehicles suffer from the Defect.  Mazda concealed the Defect and made contrary representations about the quality, durability, performance, safety features, and other attributes of the Class Vehicles.

      c. ***When***: Mazda concealed material information regarding the Defect at all times and made representations about the quality, durability, safety, and performance of the Class Vehicles, starting no later than 2016, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day.  Mazda has not disclosed the truth about the Defect in the Class Vehicles to

anyone outside of Mazda. Mazda has never taken any action to inform consumers about the true nature of the Defect in Class Vehicles. And when consumers brought their Class Vehicles to Mazda complaining of the symptoms associated with the Defect, Mazda denied any knowledge of, or responsibility for, the Defect.

d. **Where**: Mazda concealed material information regarding the true nature of the Defect in every communication it had with Plaintiffs and Class Members and made contrary representations about the quality, durability, safety features, and performance of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing in which Mazda disclosed the truth about the Defect in the Class Vehicles to anyone outside of Mazda. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on Mazda's website, none of which even discuss Ignition-on mode.

e. **How**: Mazda concealed the Defect from Plaintiffs and Class Members and made representations about the quality and durability of the Class Vehicles. Mazda actively concealed the truth about the existence and nature of the Defect from Plaintiffs and Class Members at all times, even though it knew about the Defect and knew that information about the Defect would be important to a reasonable consumer, and Mazda promised in its marketing materials that the Class Vehicles have qualities that they do not have, and moreover, made representations in its warranties that it knew were false, misleading, and deceptive.

f. **Why**: Mazda actively concealed material information about the Defect in Class Vehicles, and simultaneously made representations about the quality, durability, and performance of the Class Vehicles

29

and their Engines, for the purpose of inducing Plaintiffs and Class Members to purchase or lease the Class Vehicles, rather than purchasing or leasing competitors' vehicles. Had Mazda disclosed the truth, for example, in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of the Defect, and would not have bought the Class Vehicles or would have paid less for them.

**F.   MAZDA HAS ACTIVELY CONCEALED THE DEFECT**

136.   Despite its knowledge of the Defect in the Class Vehicles, Mazda actively concealed the existence and nature of the Defect from Plaintiffs and Class Members. Specifically, Mazda failed to disclose to or actively concealed from Plaintiffs and Class Members, at and after the time of purchase, lease, or repair, and thereafter:

    a. any and all known material defects or material nonconformities of the Class Vehicles, including the Defect;

    b. that the Class Vehicles were not in good working order, were defective, and were not fit for their intended purpose; and

    c. that the Class Vehicles were defective, even though Mazda learned of the Defect before it placed the Class Vehicles in the stream of commerce.

137.   More troubling, Mazda did not issue any recall and otherwise refuses to acknowledge the Defect.   Mazda also refuses to acknowledge ongoing complaints made as a result of the Defect, even as a vehicle has been repaired. Indeed, Mazda has refused to honor its warranty or admit the existence of the Defect after these repairs have taken place.

138.   Mazda has also directed its authorized dealerships to inform Plaintiffs and members of the Class that that that the vehicles are operating as designed and that Mazda bears no responsibility. In this way, Mazda unfairly

1    transfers the cost of repair to Plaintiffs and Class Members, and third-party

2    insurers, and reduces its own recall and warranty costs.

3        139.   Mazda has deprived Class Members of the benefit of their bargain,

4    exposed them all to a dangerous safety Defect, and caused them to expend money

5    at their dealerships and/or be unable to drive their vehicles for long stretches of

6    time, while they are repaired.

7        140.   As a result, Class Members continue to experience the Defect because

8    Mazda neither acknowledges the Defect nor makes any repair to the Defect

9    available. Because many Class Members, like Plaintiffs, are current owners or

10   lessees who rely on their vehicles on a daily basis, compensation for repairs, related

11   expenses (*e.g*., towing), and diminution in value is not sufficient. A remedial

12   scheme which also makes available a fix and provides clearer information to the

13   driver is necessary.

14       141.   Mazda has not recalled all the Class Vehicles to repair the Defect, has

15   not offered to its customers a free suitable repair related to the Defect, under the

16   recall or otherwise, and has not reimbursed all Class Vehicle owners and

17   leaseholders who incurred costs for repairs related to the Defect.

18       142.   Class Members have not received the value for which they bargained

19   when they purchased or leased the Class Vehicles.

20       143.   As a result of the Defect, the value of the Class Vehicles has

21   diminished, including without limitation, the resale value of the Class Vehicles.

22       144.   The existence of the Defect is a material fact that a reasonable

23   consumer would consider when deciding whether to purchase or lease a Class

24   Vehicle. Whether a vehicle is defective, resulting in a collision, is a material safety

25   concern. Had Plaintiffs and other Class Members known of the Defect, they would

26   have paid less for the Class Vehicles or would not have purchased or leased them.

27       145.   Reasonable consumers, like Plaintiffs, expect that a vehicle is safe,

28   will function in a manner that will not pose a safety risk, is free from defects, and

will not malfunction while operating the vehicle as it is intended. Plaintiffs and Class Members further expect and assume that Mazda will not sell or lease vehicles with known safety defects, will not display misleading messages on the dash that advise drivers to pursue unsafe actions, such as the Defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable non-defective repair.

146. The Class Vehicles do not function as Mazda intended; no manufacturer intends for a vehicle's displayed information to increase the chances of a collision.

**E.    MAZDA HAS UNJUSTLY RETAINED A SUBSTANTIAL BENEFIT**

147. Plaintiffs allege that Mazda unlawfully failed to disclose the alleged Defect to induce them and other putative Class Members to purchase or lease the Class Vehicles.

148. Plaintiffs further allege that Mazda, thus, engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs' vehicles.

149. As discussed above, therefore, Plaintiffs allege that Mazda unlawfully induced them to purchase Class Vehicles by concealing and/or omitting a material fact (the Defect) and that Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the Defect.

150. Accordingly, Mazda's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that deceive consumers should be disgorged.

**F.    THE RELATIONSHIP BETWEEN MAZDA AND ITS NETWORK OF AUTHORIZED DEALERSHIPS RELATED TO MAZDA'S WARRANTIES**

151. In order to sell vehicles to the general public, Mazda enters into

agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, Mazda-branded vehicles, the authorized dealerships are also permitted under these agreements with Mazda to service and repair these vehicles under the warranties Mazda provides directly to consumers who purchased new vehicles from the authorized dealerships.

152.    Accordingly, Mazda's authorized dealerships are Mazda's agents, and the consumers who purchase or lease Mazda vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their Mazda vehicles locally. Because Plaintiffs and members of the Class there are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

153.    Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of Mazda's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Mazda. Mazda's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of Mazda's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

154.    Mazda issued the express warranty to the Plaintiffs and the Class Members. Mazda also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Defendants also are responsible for the content of the Monroney

Stickers on Mazda-branded vehicles. Because Mazda issued the express warranty directly to the consumers, the consumers are in direct privity with Mazda with respect to the warranties.

155.   In promoting, selling, and repairing its defective vehicles, Mazda acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Mazda representatives and agents. That the dealers act as Mazda's agents is demonstrated by the following facts:

a.   The authorized Mazda dealerships complete all service and repair according to Mazda's instructions, which Mazda issues to its authorized dealerships through service manuals, service bulletins, technical service bulletins, and other documents;

b.   Consumers are able to receive services under Mazda-issued warranties at Mazda's authorized dealerships, and they are able to receive these services because of the agreements between Mazda and the authorized dealers. These agreements provide Mazda with a significant amount of control over the actions of the authorized dealerships;

c.   The warranties provided by Mazda for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

d.   Mazda has provided training and partnered with various technical schools to provide Mazda-specific training for technicians, so that dealerships are able to hire technicians that have completed Mazda-overseen certification courses;

e.   Mazda dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

f.   Mazda controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the

dealerships are able to perform repairs under warranty only with Mazda's authorization;

g. Mazda has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public; and

h. Mazda implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Mazda dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

156.   Indeed, Mazda's warranty booklets make it abundantly clear that Mazda's authorized dealerships are Mazda's agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "authorized dealerships."

157.   For example, at the outset, Mazda notifies Plaintiffs and Class Members in the warranty booklet that **"[t]he vehicle must be brought to an authorized Mazda dealer for all warranty service**."[7]

158.   Mazda's Certified Pre-Owned vehicle program also relies on the authorized dealerships performing a 160-point inspection process before the vehicles can be "certified" and offered for sale.  The dealerships perform this certification process, signing the paperwork which then obligates Mazda to provide a 100,000 mile, 7 year, whichever comes first, powertrain warranty to whomever purchases the vehicle.[8]  These factory-backed warranties are provided on the authorization of dealership personnel.

---

[7] *See e.g.*, https://www.mazdausa.com/siteassets/pdf/owners-optimized/optimized-warranty-booklet/2022-warranty-booklet.pdf

[8] *See*, https://www.mazdausa.com/certified-pre-owned

159.   Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Mazda. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either Mazda or their agent dealerships to establish privity of contract between Mazda, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and Mazda.

## G.    TOLLING OF THE STATUTES OF LIMITATIONS

### (a)  Fraudulent Concealment

160.   As previously described, any applicable statute(s) of limitations has been tolled by Mazda's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Class could not have reasonably discovered the nature of the Defect prior to this class action litigation being commenced.

161.   Mazda was and remains under the continuing duty to disclose to Plaintiffs and members of the Class the true character, quality and nature of the Class Vehicles, and the Defect will require costly repairs, poses a safety concern, and diminished the resale value of the Class Vehicles. As a result of the active concealment by Mazda, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

162.   Mazda has known of the Defect in the Class Vehicles since at least 2016, and has concealed from, or failed to, notify Plaintiffs, Class Members, and the public of the full and complete nature of the Defect, even when directly asked about it by Plaintiffs and Class Members during communications with Mazda, Mazda customer assistance, Mazda dealerships, and Mazda service centers.  Mazda continues to conceal the Defect to this day.

### (b)  Estoppel

163.   Mazda was, and is, under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles.

Mazda actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles.  Plaintiffs and Class Members reasonably relied upon Mazda's knowing and affirmative representations and/or active concealment of these facts.  Based on the foregoing, Mazda is estopped from relying on any statutes of limitation in defense of this action.

### (c)  Discovery Rule

164.   The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles suffered from the Defect.

165.   However, Plaintiffs and Class Members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Defect caused their vehicles to become inoperable when they thought the vehicles was in Engine-on mode but it was, in fact, in Ignition-on mode.

166.   Even then, Plaintiffs and Class Members had no reason to know that such failures, or the pre-failure symptoms described above, were caused by a defect in the Class Vehicles because of Mazda's active concealment of the Defect.  Not only did Mazda fail to notify Plaintiffs or Class Members about the Defect, Mazda, in fact, denied any knowledge of, or responsibility for, the Defect when directly asked about it.

167.   Thus, Plaintiffs and Class Members were not reasonably able to discover the Defect until after they had purchased or leased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Defect when they mistakenly and unknowingly placed their vehicles in Ignition-on mode and attempted to drive their vehicles.

### H.    CLASS ACTION ALLEGATIONS

168.   Plaintiffs bring this action pursuant to Rule 23(a), 23(b)(2) and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and as the

following proposed classes:

**Nationwide Class**:
All persons or entities in the United States (including its territories and the District of Columbia) that purchased or leased a Class Vehicle.

**Pennsylvania Sub-Class**:
All persons or entities that purchased or leased a Class Vehicle within Pennsylvania.

169.   Excluded from the Class are Mazda; its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Mazda; Mazda's dealers; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

170.   Certification of Plaintiffs' claims for Class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

171.   This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Fed. R. Civ. P. 23.

172.   **Numerosity**.   Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough that such joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Mazda's possession, custody, and/or control as well as from records kept by the Department of Motor Vehicles.

173.   **Commonality and Predominance**.  Rules 23(a)(2) and (b)(3) of the Federal Rules of Civil Procedure:  This action involves common questions of law and fact, which predominate over any questions affecting individual Class

Members, including, but not limited to the following:

a.  Whether Class Vehicles suffer from the Defect;

b.  Whether Mazda engaged in the conduct alleged herein;

c.  Whether the Defect constituted an unreasonable safety risk;

d.  Whether the Defect constitutes a material fact;

e.  Whether Mazda designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

f.  Whether Mazda designed, manufactured, marketed, and distributed Class Vehicles with the Defect;

g.  Whether Mazda has a duty to disclose the defective nature of the Class Vehicle to Plaintiffs and Class Members;

h.  Whether Plaintiffs and Class Members overpaid for their Class Vehicles and/or did not receive the benefit of the bargain;

i.  Whether Mazda should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses resulting from the Defect;

j.  Whether Plaintiffs and Class Members are entitled to damages and other monetary relief and, if so, in what amount;

k.  Whether Mazda's alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraud, false pretense, false promise, and misrepresentation within the meaning of the applicable state consumer fraud statutes;

l.  Whether Mazda has been unjustly enriched under applicable state laws;

m.  Whether Mazda has violated its express warranties to Plaintiffs

and Class Members;

n.  Whether Mazda breached the implied warranty or merchantability pursuant to the laws governing each of the Sub-Class jurisdictions;

o. Whether Mazda violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*.;

p.  Whether Mazda actively concealed the Defect in order to maximize profits to the detriment of Plaintiffs and Class Members; and

q.  Such other common factual and legal issues as are apparent from the allegations and causes of action asserted in this Complaint.

174.  **Typicality**.  Plaintiffs' claims are typical of the claims of the Class and Sub-Classes in the Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Mazda. The representative Plaintiffs, like all Class Members, have been damaged by Mazda's misconduct in that they have incurred or will incur the cost of repairing or replacing any vehicle damage caused by a resulting collision. Rule 23(a)(3) of the Federal Rules of Civil Procedure:  Plaintiffs' claims are typical of the other Class Members' claims because, among other things, all Class Members were comparably injured through Mazda's wrongful conduct as described above.  All claims seek recovery on the same legal theories and are based upon Mazda's common course of conduct.

175.  **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously. The Class's interests will

1  be fairly and adequately protected by Plaintiffs and their counsel.

2  176. **Declaratory Relief**. Rule 23(b)(2) of the Federal Rules of Civil

3  Procedure: Mazda has acted or refused to act on grounds generally applicable to

4  Plaintiffs and Class Members, thereby making appropriate declaratory relief, with

5  respect to each Class as a whole.

6  177. **Superiority**. Rule 23(b)(3) of the Federal Rules of Civil Procedure:

7  A class action is superior to any other available means for the fair and efficient

8  adjudication of this controversy, and no unusual difficulties are likely to be

9  encountered in the management of this class action. The damages or other

10  financial detriment suffered by Plaintiffs and Class Members are relatively small

11  compared to the burden and expense that would be required to individually litigate

12  their claims against Mazda, so it would be impracticable for Class Members to

13  individually seek redress for Mazda's wrongful conduct. Even if Class Members

14  could afford individual litigation, the court system could not. Individualized

15  litigation creates a potential for inconsistent or contradictory judgments, and

16  increases the delay and expense to all parties and the court system. By contrast,

17  the class action device presents far fewer management difficulties and provides

18  the benefits of single adjudication, economy of scale, and comprehensive

19  supervision by a single court.

20  ### I.    CAUSES OF ACTION

21  ### FIRST CAUSE OF ACTION
   **(For Fraud by Omission or Fraudulent Concealment)**
22  **(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All
   Sub-Classes Against Mazda)**

23  178. Plaintiffs incorporate by reference the allegations contained in the

24  preceding paragraphs of this Complaint.

25  179. Plaintiffs bring this cause of action on behalf of themselves and the

26  Class or, alternatively, on behalf of all Sub-Classes against Mazda.

27  180. Mazda knew that the Class Vehicles suffered from an inherent

28

Display Defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

181.    Mazda concealed from and failed to disclose to Plaintiff and Class Members the defective nature of the Class Vehicles.

182.    Mazda was under a duty to Plaintiff and Class Members to disclose the defective nature of the Class Vehicles because:

      a. Mazda was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

      b. The omitted facts were material because they directly impact the safety of the Class Vehicles;

      c. Mazda knew the omitted facts regarding the Display Defect were not known to or reasonably discoverable by Plaintiff and Class Members, particularly as Mazda does not document Ignition-on mode in its owner manuals;

      d. Mazda made partial disclosures about the quality and safety of the Class Vehicles without revealing their true defective nature; and

      e. Mazda actively concealed the defective nature of the Class Vehicles from Plaintiff and Class Members.

183.    The facts concealed or not disclosed by Mazda to Plaintiff and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Mazda's Class Vehicles or pay a lesser price for them. Whether a vehicle's Display is defective, and fails to correctly inform the driver of the state of the vehicle, is a material safety concern. Had Plaintiff and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

184.    Mazda concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiff

and Class Members to act thereon. Plaintiff and the other Class Members justifiably relied on Mazda's omissions to their detriment. This detriment is evident from Plaintiff and Class Members' purchase or lease of Mazda's defective Class Vehicles.

185.    Mazda continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Mazda continues to cover up and conceal the true nature of the problem today.

186.    As a direct and proximate result of Mazda's misconduct, Plaintiff and Class Members have suffered and will continue to suffer actual damages. Plaintiff and the Class reserve their right to elect either to (a) rescind their purchase or lease of the defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective Vehicles and recover damages.

187.    Mazda's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being to enrich Mazda. Mazda's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## SECOND CAUSE OF ACTION
### (For Unjust Enrichment)
### (On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Mazda)

188.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

189.    Plaintiff bring this cause of action on behalf of himself and the Class or, alternatively, on behalf of all Sub-Classes against Mazda.

190.    Mazda has received and retained a benefit from Plaintiff and the members of the Class, and inequity has resulted.

191.    As a direct and proximate result of Mazda's failure to disclose known defects, Mazda have profited through the sale and lease of the Class Vehicles, the

value of which was artificially inflated by Mazda's concealment of and omissions regarding the Defect. Mazda charged higher prices for the vehicles than the vehicles' true value, and Plaintiff and Class Members thus overpaid for the Class Vehicles. Although these vehicles are purchased through Mazda's authorized dealers and distributors, the money from the vehicle sales flows directly back to Mazda.

192.  Additionally, as a direct and proximate result of Mazda's failure to disclose known defects in the Class Vehicles, Plaintiff and Class Members have vehicles that require high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Mazda.

193.  Mazda has been unjustly enriched due to the known defects in the Class Vehicles through the use of money paid that earned interest or otherwise added to Mazda's profits when said money should have remained with Plaintiff and Class Members.

194.  Plaintiff and Class Members were not aware of the true facts regarding the Defect in the Class Vehicles and did not benefit from Mazda's unjust conduct.

195.  As a result of the Mazda's unjust enrichment, Plaintiff and Class Members have suffered damages.

196.  Plaintiff does not seek restitution under their unjust enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Mazda obtained as a result of its unjust conduct.

197.  Additionally, Plaintiff seeks injunctive relief to compel Mazda to offer, under warranty, remediation solutions that Mazda identifies. Plaintiff also seek injunctive relief enjoining Mazda from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Mazda from selling the Class Vehicles with the misleading information; compelling Mazda to provide Class Members with a replacement vehicles that do not contain the defects alleged

herein and/or to update its software to display accurate information; update its owners' manuals to inform owners and lessees of Ignition-on mode and warn them not to shift out of Park; compelling Mazda to contactt third-party insurers to inform them that accidents and collisions that resulted from the Display Defect should not be considered driver-fault incidences; and/or compelling Mazda to reform its warranties, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranties have been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

**Claims on Behalf of the Pennsylvania Sub-Class**

**THIRD CAUSE OF ACTION**
**Violations of the Pennsylvania Deceptive and Unfair Trade Practices and Consumer Protection Law,**
**73 P.S. § 201-1, *et seq*.**
**(On Behalf of the Pennsylvania Sub-Class)**

198.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

199.    Plaintiff Joshua Meltzer ("Pennsylvania Plaintiff") brings this cause of action individually and on behalf of the Pennsylvania Sub-Class.

200.    Mazda's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Pennsylvania Unfair Trade Practices and Consumer Protection Law 73 PS § 201-1("Pennsylvania CPL").

201.    Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2).

202.    Mazda's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of Pennsylvania CPL 73 P.S. § 201-2(3).

203.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices,

including: (a) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (b) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (c) "Advertising goods or services with intent not to sell them as advertised;" and (d) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4). Mazda engaged in unfair and deceptive practices that violated the Pennsylvania CPL as described above.

204.    Mazda knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Display Defect; concealing the Display Defect; promoting and selling or leasing Class Vehicles they knew were defective, including by marketing their vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting themselves as reputable manufacturers that valued safety, reliability, performance and efficiency, and stood behind their vehicles after they were sold; failing to make repairs or making repairs that caused Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members to continue to experience the Defect, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Mazda misrepresented and omitted such material facts with the intent to mislead Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members about the true nature of the Class Vehicles.

205.    Mazda systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Display Defect in the course of its business.

206.    Mazda also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment,

suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

207.    Mazda's unfair and deceptive acts or practices occurred repeatedly in Mazda's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

208.    Mazda knew that the Class Vehicles suffered from an inherent defect, were defectively designed, and were not suitable for their intended use.

209.    Mazda knew or should have known that their conduct violated the Pennsylvania CPL.

210.    Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members reasonably relied on Mazda's misrepresentations and omissions of material facts in their advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

211.    Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members had no way of discerning that Mazda's misrepresentations were false and misleading when they acquired their Class Vehicles because Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members did not have access to Mazda's exclusive and superior knowledge about the Class Vehicles' design and the Display Defect.

212.    Had Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members known that the Class Vehicles would contain and/or exhibit the Display Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Mazda's misconduct.

213.    Mazda owed Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members a duty to disclose the truth about the Display Defect because Mazda:

a.    possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and Defect;

b.     intentionally concealed the foregoing from Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members; and/or

c.     made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members that contradicted these representations.

214.    Due to Mazda's specific and superior knowledge that the Displays in the Class Vehicles will display misleading information as a result of the Display Defect, their false representations regarding the increased reliability and safety of the Class Vehicles, and reliance by Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members on these material representations, Mazda had a duty to disclose to Class Members that the Display Defect exists in the Class Vehicles, that Class Vehicles do not have the expected reliability, and/or safety over other vehicles or of their predecessor vehicles, that the Display Defect can increase the chance of a collision and damage to Class Vehicle, and that Class Members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members, Mazda had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Mazda consumers. Mazda represented to Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the displays fail due to the Display Defect.

215.    Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members

suffered injury in fact to a legally protected interest. As a result of Mazda's conduct, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

216. As a direct and proximate result of Mazda's unfair or deceptive acts or practices, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

217. Mazda's violations present a continuing risk to Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members as well as to the general public. Mazda's unlawful acts and practices complained of herein affect the public interest.

218. As a proximate and direct result of Mazda's unfair and deceptive trade practices, Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Display Defect, replacement of defective and/or damaged components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

219. As a direct and proximate result of Mazda's unfair or deceptive acts or practices alleged herein, Pennsylvania Plaintiff and other members of the Pennsylvania Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. In addition, Pennsylvania Plaintiff and the putative Class seek equitable and injunctive relief against Mazda on terms that the Court considers reasonable, and reasonable attorneys' fees.

220. Pennsylvania Plaintiff provided notice of their claims by letter dated July 1, 2024.

221. The foregoing acts, omissions, and practices proximately caused

Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members to suffer real damages in the form of, *inter alia*, overpaying for the vehicles, as well as diminution of value of the vehicles, and they are entitled to recover such damages, together with all other appropriate damages, attorneys' fees, and costs of suit.

### FOURTH CAUSE OF ACTION
**Breach of the Implied Warranty of Merchantability**
**13 PA. Cons. Stat. §§ 2314 and 2A212**
**(On behalf of the Pennsylvania Sub-Class)**

222. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

223. Pennsylvania Plaintiff brings this cause of action individually and on behalf of the members of the Pennsylvania Sub-Class.

224. Mazda is and was at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

225. With respect to leases, Mazda is and was at all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

226. The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

227. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 13 Pa. Cons. Stat. §§ 2314 and 2A212.

228. Mazda knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Mazda directly sold and marketed vehicles equipped with the Display Defect to customers through authorized dealers, like those from whom Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing or leasing the vehicles. Mazda knew that the Class Vehicles would and did pass unchanged from Mazda to the authorized dealers to

Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members, with no modification to the defective Displays.

229.    Mazda provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

230.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their Display that were manufactured, supplied, distributed, and/or sold by Mazda were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their Display would be fit for their intended use while the Class Vehicles were being operated.

231.    Contrary to the applicable implied warranties, the Class Vehicles and their Display, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design, installation, and manufacture of their Display and the existence of the Display Defect at the time of sale or lease and thereafter. Mazda knew of this defect at the time these sale or lease transactions occurred.

232.    As a result of Mazda's breach of the applicable implied warranties, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Display Defect, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' Display components are substantially certain confuse the driver.

233.    Mazda's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of 13 Pa. Cons. Stat. §§ 2314 and 2A212.

234.    Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members

have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Mazda's conduct described herein.

235. Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members were not required to notify Mazda of the breach because affording Mazda a reasonable opportunity to cure their breach of implied warranty would have been futile. Mazda were also on notice of the Display Defect from the complaints and service requests they received from Plaintiffs and the Class Members, from repairs and/or replacements of the Display or components thereof, and through other internal sources.

236. In addition, on or about July 1, 2024, Pennsylvania Plaintiff gave notice to Mazda that he intended to pursue his warranty claims on behalf of a class of similarly situated consumers.

237. Because Pennsylvania Plaintiff purchased his vehicle and received the remainder of the transferable warranties provided directly by Mazda, he has privity with Mazda and is also the intended third-party beneficiary of Mazda's implied warranties and the contracts between Mazda and their authorized dealers for the purposes of warranty repairs.

238. As a direct and proximate cause of Mazda's breach, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

239. As a direct and proximate result of Mazda's breach of the implied warranty of merchantability, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members have been damaged in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**(Breach of Implied Warranty under the Magnuson-Moss Warranty Act,**
**15 U.S.C. § 2303 *et seq.*)**
**(On Behalf of on behalf of Plaintiff Meltzer)**

240.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

241.    Plaintiff brings this cause of action on behalf of himself against Defendants.

242.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

243.    Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

244.    Mazda are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

245.    Mazda impliedly warranted that the Class Vehicles were of merchantable quality and fit for use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles manufactured, supplied, distributed, and/or sold by Mazda would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

246.    Contrary to the applicable implied warranties, the Class Vehicles, including Plaintiff's vehicle, at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective design of their vehicles.

247.    Mazda's breach of implied warranties has deprived Plaintiff of the benefit of his bargain.

248.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets

or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

249.   Mazda has been afforded a reasonable opportunity to cure their breach, including when Plaintiff brought his vehicle in for diagnosis and repair.

250.   As a direct and proximate cause of Mazda's breach of implied warranties, Plaintiff sustained and incurred damages and other losses in an amount to be determined at trial. Mazda's conduct damaged Plaintiff, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

251.   As a result of Mazda's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiff has incurred damages.

252.   Plaintiff also provided notice to Mazda of its breach of warranty claims under the MMWA by letter dated July 1, 2024.

## RELIEF REQUESTED

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court enter judgment against Mazda, as follows:

(a)   An order certifying the proposed Class and Sub-Classes, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

(b)   A declaration that Mazda is financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

(c)   An order enjoining Mazda from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Mazda to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Mazda to repair and eliminate the Defect from every Class Vehicle; enjoining Mazda from selling the Class Vehicles with the misleading information; and/or compelling Mazda to reform its warranty, in a manner deemed to be appropriate by the Court, to

cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(d) An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(e) Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(f) A declaration that Mazda must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles or make full restitution to Plaintiffs and Class Members;

(g) An award of attorneys' fees and costs, as allowed by law;

(h) An award of pre-judgment and post-judgment interest, as provided by law;

(i) Leave to amend the Complaint to conform to the evidence produced at trial; and

(j) Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) and Central District of California Local Rule 38-1, Plaintiffs hereby demand a trial by jury of all issues in this action so triable.

Dated: September 6, 2024                    Respectfully submitted,

                                            BERGER MONTAGUE PC


                                       By: /s/Sophia M. Rios
                                            Sophia M. Rios
                                            srios@bm.net
                                            BERGER MONTAGUE PC
                                            8241 La Mesa Blvd., Suite A
                                            La Mesa, CA 91942
                                            Tel: (619) 498-0300

Russell D. Paul*
rpaul@bm.net
Abigail J. Gertner*
agertner@bm.net
Amey J. Park*
apark@bm.net
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604

*pro hac vice forthcoming

Attorneys for Plaintiffs

CLASS ACTION COMPLAINT